PLAVECSKI et al., Appellants,

v.

CLEVELAND CLINIC FOUNDATION, Appellee.

[Cite as *Plavecski v. Cleveland Clinic Found.*, 192 Ohio App.3d 533, 2010-Ohio-6016.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 93917.

Decided Dec. 9, 2010.

534

Landskroner, Grieco, Madden, L.L.C., Justin F. Madden, Paul Grieco, and Drew Legando, for appellants.

Roetzel & Andress, L.P.A., Anna M. Carulas, Douglas G. Leak, and Tammi J. Lees, for appellee.

SEAN C. GALLAGHER, Administrative Judge.

{¶ 1} Appellant Pamela Plavecski[1] appeals the jury verdict rendered in favor of appellee Cleveland Clinic Foundation ("CCF")[2] finding that Dr. Marc

---

1.  The underlying case and appeal were filed by both Pamela and Richard Plavecski, her husband, who filed a claim for loss of consortium. At issue on appeal, however, is the negligence claim brought by Pamela.

2.  In this case, CCF agreed to be held vicariously liable for the acts of its employee, Dr. Marc Williams.

Williams's negligence was not the proximate cause of Plavecski's medical condition and resultant surgery. For the reasons stated herein, we affirm.

{¶ 2} On February 3, 2005, Plavecski sought medical treatment for a vaginal infection. Her family doctor, Dr. Williams, was not available to see her on the date she came into the office, but another physician in his practice, Dr. Tulisiak, examined her and prescribed the antibiotic clindamycin. On February 7, Dr. Tulisiak learned from Plavecski's lab results that pseudomonas was present, so he prescribed an additional antibiotic, Cipro.

{¶ 3} On February 8, Plavecski called the office to report that she was experiencing abdominal cramping and diarrhea. Dr. Meacham, the physician on call, advised her to discontinue the clindamycin, to continue the Cipro, and to see Dr. Williams the next day. On February 9, Dr. Williams met with Plavecski in his office to review her symptoms and medical condition. Plavecski advised the medical assistant that the medication had made her sick. During Dr. Williams's examination, he discovered that Plavecski's vaginal infection was improved, but he also scheduled her for a pelvic ultrasound that afternoon.

{¶ 4} The results of Plavecski's ultrasound were normal according to the report provided to Dr. Williams on February 10, and Plavecski was notified of the results that day. Plavecski did not call or otherwise contact Dr. Williams's office between February 11 and February 20. On February 21, Plavecski called Dr. Williams's office to report that she was experiencing diarrhea and vomiting, which began on February 20. She indicated to the medical assistant who took her call that she had finished taking Cipro on the previous Thursday, February 17. On February 22, Dr. Williams received the information regarding Plavecski's condition, and he recommended she take over-the-counter Imodium, an antimotility agent, to control the diarrhea. Dr. Williams did not examine Plavecski or speak to her on the phone; the information and recommendation to take Imodium was communicated to Plavecski over the phone by Dr. Williams's medical assistant, as was the procedure in this medical office.

{¶ 5} On February 23, Plavecski called Dr. Williams's office reporting that her mother had passed away the day before, that she had some stomach cramping, and that her diarrhea had improved slightly. She asked for a prescription for something to help her get through her mother's wake. Relying on this information, Dr. Williams prescribed Ativan, an antianxiety medication, for Plavecski. He also suggested that she continue taking Imodium for her diarrhea. Dr. Williams did not examine Plavecski or speak to her on the phone, but again relied on his assistant to speak with her, as was his office's practice.

{¶ 6} On February 24, Plavecski called Dr. Williams's office to inform him that her diarrhea was persistent. Dr. Williams had Plavecski bring in a stool sample;

he also prescribed Flagyl.[3] On February 25, Plavecski called Dr. Williams's office to obtain her lab results from the stool sample; she also reported persistent diarrhea. The medical assistant who took Plavecski's call made a note that the patient sounded short of breath, although Plavecski did not herself report that she was experiencing shortness of breath. Based on this information, Dr. Williams advised Plavecski to seek emergency care. Plavecski went to the emergency room at Medina General Hospital on February 25, where she was admitted. The results of Plavecski's stool sample showed she was positive for the bacteria Clostridium difficile ("C.diff."). C.diff. is a bacteria normally found in the colon, but can cause infection or colitis in patients who have been taking certain antibiotics. Infection is generally caused by a build-up of toxins related to an overpopulation of C.diff. bacteria. Under normal circumstances, patients who contract a C.diff. infection improve once they stop taking antibiotics.

{¶ 7} While an in-patient at Medina General Hospital, Plavecski was treated for C.diff. colitis. On March 5, 2005, she was transferred to Cleveland Clinic Hospital, where she underwent a colectomy to remove most of her colon. She later required additional surgery for removal of the temporary ileostomy bag that was created during her March 5 surgery.

{¶ 8} On August 27, 2008, Plavecski filed her complaint against Dr. Williams and CCF, alleging medical malpractice. Prior to trial, Plavecski filed several motions in limine. The motions that are relevant to this case sought to preclude reference to certain articles published in The Plain Dealer, which postdated her surgery, to preclude CCF's expert, Dr. Keith Armitage, from testifying about the existence of an epidemic strain of the C.diff. bacteria, and to preclude any reference to an unfinished clinical trial that examined the connection between the use of antimotility medications by patients with C.diff. Of these three motions, the trial court granted only Plavecski's motion that would preclude CCF's expert from referring to the unfinished clinical trial.

{¶ 9} On June 22, 2009, a jury trial commenced. Plavecski's expert, Dr. John Schaefer, opined that Dr. Williams's advice to Plavecski that she take Imodium to control her diarrhea was what caused her need for a colectomy. Dr. Schaefer testified that had Dr. Williams considered Plavecski's recent course of antibiotics for the vaginal infection, he would have known that Plavecski was likely to have a build-up of C.diff. bacteria in her colon. He testified that Imodium, an antimotility medication, typically stops diarrhea from flushing out toxins that come from a build-up of the C.diff. bacteria, and the toxins destroy the colon wall. Dr.

---

3. Flagyl is an antibiotic that eliminates bacteria that cause infections in certain parts of the body, including the gastrointestinal tract; it is specifically prescribed for the treatment of C.diff.

Schaefer further testified that the use of Imodium is contraindicated for C.diff., and had Dr. Williams tested Plavecski for C.diff. bacteria before advising that she take Imodium, she would not have needed a colectomy.

{¶ 10} Dr. Williams testified that he did not initially suspect that Plavecski had C.diff. based on her reported flu-like symptoms of diarrhea and vomiting, especially since she had stopped taking all antibiotics as of February 17. He stated that she had not communicated to his office that her diarrhea had persisted between February 9 and February 20. Dr. Williams determined on February 22 that two reported days of diarrhea and vomiting indicated that Plavecski had intestinal flu. He also testified that Imodium was not the cause of her need for a colectomy. His conclusion was based on information that Dr. Williams had learned from medical literature published after Plavecski's surgery showing that otherwise healthy patients who presented with the same symptoms she had were infected with the epidemic strain of C.diff. and did not respond to traditional therapy used in treating the ordinary strain of C.diff. Dr. Williams also testified that the Imodium did not actually stop her diarrhea, which meant that the body continued to flush toxins from her colon; therefore, the Imodium could not be the cause of the severity of Plavecski's infection, and instead she must have been infected with the more virulent strain of C.diff.

{¶ 11} Dr. Armitage testified that he conducted a comprehensive review of Plavecski's medical records and compared her symptoms with those of other patients who were known to have contracted an epidemic strain of C.diff. He opined that Plavecski needed a colectomy because she was infected with the epidemic strain of C.diff. He testified that he drew his conclusion about her condition from reviewing medical literature dated in late 2005 and 2006 and comparing it to the Plavecski's symptoms. These articles identified a previously unknown strain of C.diff. that was more virulent and not responsive to therapy used in treating the ordinary strain of C.diff.; this epidemic strain was being reported in Canada and in 16 states in the United States, including Ohio.

{¶ 12} The research showed that the more virulent strain was affecting individuals who were not in high-risk populations; in other words, it was presenting in patients who were relatively young, not immunosuppressed, and not recently hospitalized. Dr. Armitage testified that had Plavecski had the ordinary strain, she would have gotten better once she stopped taking antibiotics regardless of her use of Imodium; the fact that her condition did not improve indicated that she was affected with the epidemic strain, and therefore Dr. Williams's advice to Plavecski that she take Imodium did not cause her need for a colectomy.

{¶ 13} The jury found that Dr. Williams deviated from the standard of care, but that Plavecski had not demonstrated that his negligence in prescribing Imodium was the proximate cause of her injuries. On July 7, 2009, Plavecski

filed a motion for judgment notwithstanding the verdict ("JNOV") and/or motion for a new trial. On August 13, 2009, the trial court denied both of Plavecski's posttrial motions.

{¶ 14} On September 11, 2009, Plavecski filed the instant appeal, citing one assignment of error for our review.

{¶ 15} "I. The trial court erred when it (a) allowed the defense to present to the jury medical literature and studies which were based upon information that occurred months or years after the plaintiff was injured by medical malpractice; (b) allowed the defense to present expert testimony which failed to meet the reliability test of Evid.R. 702(C) and *Daubert*; (c) allowed the defense to persuade the jury to base inferences upon inferences and thereby find in favor of the defendant in the issue of causation. Finally the trial court erred by denying plaintiffs' motion for judgment notwithstanding the verdict or a new trial."

{¶ 16} In her sole assignment of error, Plavecski raises several issues related to evidentiary rulings by the trial court and its failure to set aside the jury verdict. We address them in the order she presents them. We also recognize that we are in the somewhat unusual position of analyzing how a jury finds negligence but not proximate cause.

{¶ 17} Plavecski first argues that the trial court should not have allowed Drs. Williams and Armitage to use articles that postdated Plavecski's surgery. She points specifically to newspaper articles and medical literature that discuss the existence of an epidemic strain of C.diff. that was being diagnosed in parts of the United States in late 2005.

{¶ 18} The admission of evidence lies within the broad discretion of the trial court. *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323. A reviewing court will uphold an evidentiary decision absent an abuse of discretion that has affected the substantial rights of the adverse party or is inconsistent with substantial justice. Id.

{¶ 19} The trial court allowed Drs. Williams and Armitage to make limited reference to newspaper articles published in The Plain Dealer[4] on the subject of the epidemic strain of C.diff. Newspaper articles are self-authenticating, pursuant to Evid.R. 902(6); however, newspaper articles are generally inadmissible as evidence of the facts stated in them. *In re Waste Technologies Industries* (1998), 132 Ohio App.3d 145, 724 N.E.2d 819. Upon review of the portion of the transcript provided by Plavecski, reference to the articles was used

---

4. The articles were not cited by their headlines, nor were they introduced into evidence. Furthermore, Plavecski did not object to Drs. Williams's and Armitage's testimony regarding the articles at trial.

to demonstrate at what point in time the public was made aware of the epidemic strain of C.diff. and its presence in Ohio. Because these articles were offered to establish time parameters, and not the truth of the content in them, we do not find that the trial court abused its discretion by allowing Drs. Williams and Armitage to mention these newspaper articles.

{¶ 20} Plavecski also complains that Drs. Williams and Armitage should not have been permitted to refer to medical literature published after her surgery to show that she had the epidemic strain of the C.diff. bacteria. With respect to using postdated medical literature to demonstrate when the medical community became aware of the epidemic strain, we apply similar reasoning to the trial court's decision to allow the doctors to use the newspaper articles and find no error.

{¶ 21} However, Plavecski argues that CCF used postdated articles to prove that she had the epidemic strain, which was improper as a case of building inference upon inference without a factual basis. We disagree. Plavecski cites no case law in which it is said to be per se error to allow a doctor to rely on postdated medical research to opine on the identity or cause of a disease or illness.[5] In fact, it makes no sense to have a rule that doctors cannot rely on the most up-to-date medical research to diagnose previously contracted illnesses or diseases. See, e.g., *Sturm v. Univ. of Cincinnati Med. Ctr.* (2000), 137 Ohio App.3d 557, 739 N.E.2d 364. We find no error in the introduction of evidence from postdated medical literature.

{¶ 22} Plavecski also challenges Dr. Armitage's testimony about the epidemic strain of C.diff. as being in violation of *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, and Evid.R. 702.[6] She argues that Dr. Armitage's testimony is neither reliable nor relevant to the facts in her case.

{¶ 23} In *Daubert*, the United States Supreme Court explained that a trial court must act as "gatekeeper" to assure both the relevance and reliability of expert testimony before it is admitted into evidence at trial. Id. The court listed factors that a trial court may consider in determining whether expert testimony is relevant and reliable. Id. The Ohio Supreme Court adopted the *Daubert*

---

**5.** We note that the postdated material is not being used here to establish the standard of care, as the jury found Dr. Williams negligent on that issue. This is also not a case in which the patient-plaintiff is attempting to prove what a doctor should have known at the time of treatment based on later-discovered medical research.

**6.** Nothing in Plavecski's brief suggests that she is contesting admission of Dr. Armitage's testimony under Evid.R. 702(A) or (B). Evid.R. 702(C) generally applies when a witness's testimony reports the result of a procedure, test, or experiment.

analysis in *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 687 N.E.2d 735, in which it stated: "In analyzing the admissibility of expert testimony, it is important for trial courts to keep in mind the separate functions of judge and jury, and the intent of *Daubert* to * * * make it easier to present legitimate conflicting views of experts for the jury's consideration. Thus, a trial court's role in determining whether an expert's testimony is admissible under Evid.R. 702(C) focuses on whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial." (Citations omitted.)

{¶ 24} We do not find a successful *Daubert* challenge here. Dr. Armitage did not rest his opinion on a theory or method, the reliability of which would be subject to peer review or acceptance in the medical community. Instead he rested his opinion on medical literature from recognized, well-respected medical journals, which identified an epidemic strain of C.diff., the symptoms of which mirror Plavecski's.

{¶ 25} Dr. Armitage testified that the literature demonstrated a connection between the use of fluoroquinolones, of which Cipro is one, and the epidemic strain of C.diff., as well as an increase in the number of otherwise healthy patients presenting with the epidemic strain. He drew the conclusion that Plavecski most likely had the epidemic strain, although no pathology report was conducted to confirm or deny this, because she had taken Cipro, and her symptoms were similar to those found in otherwise healthy patients who received similar treatment, but still went on to have their colons removed. He also testified that the physicians at Medina General Hospital had prescribed fluoroquinolone-based antibiotics for a short period of time when Plavecski was first admitted there. Dr. Armitage's opinions were based on scientifically valid principles derived from his knowledge of medical research on C.diff. He also opined that the use of Imodium had no affect on Plavecski's condition, regardless of the strain of C.diff. she had contracted.

{¶ 26} In the absence of interrogatories detailing the jury's findings, we cannot determine whether the jury concluded that Plavecski had the epidemic strain of C.diff. bacteria. The evidence at trial may have led the jury to conclude, in the alternative, that Plavecski had the ordinary strain of C.diff., which progressed to a point where removal of her colon was necessary. According to Plavecski's own expert, Dr. Schaefer, some patients with C.diff. infections who never took Imodium nonetheless needed to have their colons removed. Nevertheless, assuming the jury believed Dr. Armitage's conclusion over Dr. Schaefer's conclusion, this in and of itself is not violative of *Daubert*.

{¶ 27} This is not an instance of inference stacking. Dr. Armitage considered the facts before him, and opined on the connection between Plavecski's symptoms

and outcome and the symptoms and outcomes for patients infected with the epidemic strain of C.diff. The epidemic strain had been found in patients in Northeast Ohio when Plavecski was ill. We do not find that the trial court abused its discretion by allowing Dr. Armitage's testimony about the epidemic strain of the C.diff. infection and whether his review of Plavecski's medical record led him to conclude that she was infected with that strain.

{¶ 28} Plavecski next argues that the trial court should not have allowed Dr. Armitage to testify about Dr. Koo's article entitled "Antimotility Agents for the Treatment of *Clostridium difficile* Diarrhea and Colitis" ("Koo article"). She argues that CCF ignored the trial court's granting of her motion to preclude reference to the Koo article. However, Plavecski's motion in limine to preclude reference to unfinished clinical trials was granted; this is a separate body of work from the Koo article.

{¶ 29} The Koo article reviews several studies that questioned the connection between antimotility agents and C.diff. The author concludes that use of medications like Imodium does not make C.diff. more severe, but that further study is needed. However, the Koo article itself is not the unfinished clinical trial cited in Plavecski's motion in limine. Thus, CCF did not violate the court's order to exclude the clinical trial.

{¶ 30} Furthermore, Plavecski cannot now complain about defense testimony regarding the Koo article when her expert was the first to testify about its theories in his videotaped deposition. See *Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus ("A party will not be permitted to take advantage of an error which he himself invited or induced").

{¶ 31} While we understand that CCF included the Koo article among the articles intended for its expert to rely upon, it was initially introduced by Plavecski through Dr. Schaefer's testimony.

{¶ 32} Finally, Plavecski argues that the trial court improperly allowed the defense to present inference based on inference to lead the jury to reject a finding of causation, as well as erred in denying her motion for JNOV and motion for new trial. Specifically, Plavecski argues that because there was no evidence that she was afflicted with the epidemic strain of C.diff., the jury had to find that taking Imodium on Dr. Williams's advice caused her injuries. We acknowledge that we are faced with trying to understand how a jury could find negligence but not proximate cause. Yet we find Plavecski's argument to be without merit.

{¶ 33} "When ruling on a motion for judgment notwithstanding the verdict, a trial court employs the same test applicable to a motion for directed verdict. That is, the evidence as adduced at trial and as borne by the record

must be construed most strongly in favor of the party against whom the motion is made. Where there is substantial evidence to support the non-movant's side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination when ruling upon either of the above motions. Appellate review of a motion for judgment notwithstanding the verdict is de novo." (Citations omitted.) *Perla v. Cleveland Clinic Found.*, Cuyahoga App. No. 83058, 2004-Ohio-2156, 2004 WL 906115.

{¶ 34} "When an appellate court reviews the denial of a motion for a new trial, the appellate court reviews whether the trial court's decision constituted an abuse of discretion. Absent some indication that the trial court's exercise of its discretion was unreasonable, arbitrary, or unconscionable, the judgment of the trial court will not be disturbed." (Citations omitted.) *Collins v. Colonna*, Cuyahoga App. No. 93901, 2010-Ohio-3613, 2010 WL 3044641.[7]

{¶ 35} On the evidence before us, we find that the trial court properly denied both of Plavecski's motions. There was evidence presented by both sides that ordinary C.diff. colitis is caused by the use of antibiotics that attack the bacteria in the colon, causing a build-up of toxins that leads to damage to the colon wall. Dr. Armitage testified that Plavecski's use of Cipro, which was later found to increase an otherwise healthy patient's chance of contracting the epidemic strain of C.diff., was ultimately the cause of her colectomy. He also testified that he believed that Plavecski had the epidemic strain of C.diff., although he acknowledged that no test was done to confirm his belief. Finally, Dr. Armitage testified, as did Dr. Williams, that there were no studies that definitively linked the use of Imodium by patients with C.diff. to the removal of their colons.

{¶ 36} Plavecski's expert, Dr. Schaefer, testified that he knew of cases in which patients with the ordinary strain of C.diff. who had not taken Imodium needed colectomies; he also testified that he had seen cases in which patients with the ordinary strain of C.diff. who took Imodium did not need colectomies. Both Dr. Williams and Dr. Armitage testified that taking Imodium was not the cause of Plavecski's colectomy.

{¶ 37} Thus, this is not a case where the evidence presented to the jury was one of stacking inference upon inference to lead to a sole, unsupported conclusion. Instead, CCF's expert opined that the symptoms experienced by Plavecski were similar enough to those of similarly situated patients known to have the epidemic strain of C.diff. for him to conclude that she was afflicted with the epidemic

---

7. While Plavecski filed only a partial transcript, which ordinarily would be an impediment to appellate review of denials of a motion for JNOV and for a new trial, in this case, we find that the portions of the transcript in the record, including the testimony of Dr. Williams and both parties' experts, were sufficient.

strain. We do not find that there is too great an analytical gap between Plavecski's condition and that of other patients with the epidemic strain for the jury to reject Plavecski's proximate cause theory.[8]

{¶ 38} We cannot know whether the jury agreed with Dr. Armitage's conclusion or whether the jury found that Plavecski's use of Imodium was inconsequential to her outcome regardless of which strain she had contracted. We only know that the jury found that Plavecski's use of Imodium did not cause her injuries.[9]

{¶ 39} This finding is not against the manifest weight of the evidence. Resolution of the factual question on causation was before the jury on properly admitted evidence. Relying on the evidence available to us on review, we find no error below.

Judgment affirmed.

BLACKMON and STEWART, JJ., concur.

8. {¶ a} We find the factual scenario in *Gen. Elec. Co. v. Joiner* (1997), 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508, distinguishable from our facts. In that case, the Supreme Court held that the district court properly excluded an expert report that presented too great an analytical gap between laboratory studies conducted on infant mice exposed to massive doses of PCB injected directly into their stomachs as opposed to adult humans exposed to PCBs in the workplace, and where the mice contracted a different type of cancer than the plaintiff developed. Id.

{¶ b} In this case, Dr. Armitage implied that Plavecski had the epidemic strain of C.diff. by comparing actual symptoms experienced by patients known to have the epidemic strain and the actual symptoms Plavecski experienced.

9. There is a reference to jury interrogatories in CCF's brief in opposition to Plavecski's motion for JNOV, but the interrogatories themselves were not made part of the record on appeal.